**UNITED STATES of America**

v.

**GREEN DRUGS and Raymond S. Kauffman, Appellants.**

No. 89–1850.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) April 2, 1990.

Decided June 15, 1990.

Rehearing and Rehearing In Banc Denied July 26, 1990.

Earl G. Kauffman, Philadelphia, Pa., for appellants.

Michael M. Baylson, U.S. Atty., James G. Sheehan, Asst. U.S. Atty., Chief, Civ. Div., David F. McComb, Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before MANSMANN, SCIRICA and SEITZ, Circuit Judges.

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal from a judgment assessing fines against a retail pharmacy and its owner, we are faced with the question of whether strict liability may be imposed for civil violations of the recordkeeping provisions of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. §§ 801–971. The defendants argued, and the district court found, that the audit shortages—though substantial—resulted through inadvertence and human error. We conclude that the district court correctly ruled that the Act provides for liability without fault and will thus affirm.

I.

In October of 1986 the Drug Enforcement Administration, acting pursuant to an administrative inspection warrant, conducted an investigative audit of Green Drugs, a Philadelphia retail pharmacy, and its owner and manager, Raymond Kauffman, a registered pharmacist.[1] DEA investigators re-

---

1. At trial the government presented evidence that Green Drugs attracted DEA's attention be- cause it was one of the state's largest purchasers of several Schedule II controlled substances.

viewed Green Drugs' records and stock, and noted that the pharmacy's receipt records accounted for more quantities of drugs than its dispensing records and inventory showed. Specifically, the investigators found shortages of 4,798 Percodan tablets, 1,902 Percocet tablets, and 2,753 Preludin tablets.

The government commenced this civil action with a three-count complaint, alleging that the defendants' failure to keep complete and accurate records of each drug violated the recordkeeping provisions of the Comprehensive Drug Abuse Prevention and Control Act, popularly known as the Controlled Substances Act, 21 U.S.C. §§ 827(a), (b) & 842(a)(5). The government sought a $25,000 civil penalty for each count.

At trial, the government presented corrected shortage figures: 1,698 Percodan tablets, 1,697 Percocet tablets, and 2,752 Preludin tablets. The defendants challenged the government's computation of the shortages, contending that the deficiencies were minor considering the large quantities of drugs processed by the pharmacy, and were due to human error and "inadvertent mistake." The defendants further argued that, as a matter of law, they could not be held liable because the recordkeeping provisions do not provide for strict liability.

The district court entered judgment in favor of the government. Accepting Kauffman's testimony, the court found that the shortages in the pharmacy's inventory were "inadvertent and innocent" and that the defendants acted in good faith. The court stated, however, that Congress had "imposed strict liability on retail pharmacists to account for Schedule Two substances," and "decreed that good faith is not a defense to inaccurate record keeping." The district court took into account the defendants' innocent motives and corrective measures before assessing a $6,000

fine, $2,000 for each count. The pharmacy and its owner appeal.

We have jurisdiction to review the final order of the district court under 28 U.S.C. § 1291. The question presented on appeal is whether a civil violation of the recordkeeping provisions of the Act may be found and punished by a fine where the shortages are due to human error and no intent to violate the statute has been shown. The defendants would add, "and where no illegal gains have been realized." Although the issue has received some mention in cases decided under the statute, *United States v. Williams*, 416 F.Supp. 611, 614 (D.D.C.1976); *United States v. Barbacoff*, 416 F.Supp. 606, 610 (D.D.C.1976), it is apparently one of first impression before the Courts of Appeals. Because the matter involves application and interpretation of legal precepts, our standard of review is plenary. *United States v. Engler*, 806 F.2d 425, 431 (3d Cir.1986), *cert. denied*, 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987); *Dent v. Cunningham*, 786 F.2d 173, 175 (3d Cir.1986).

## II.

Every registrant under the Controlled Substances Act engaging in the "manufacture, distribution, or dispensing of controlled substances" is required to "make a complete and accurate record of all stocks thereof on hand." [2] 21 U.S.C. § 827(a)(1). Section 827(a)(3) likewise requires the registrant to maintain "a complete and accurate record of each ... substance manufactured, received, sold, delivered, or otherwise disposed." *Id.* § 827(a)(3). Such records must be maintained in strict accordance with regulations promulgated by the Attorney General and be available for inspection and copying by authorized officials for at least two years. *Id.* § 827(b). Failure to maintain the requisite records constitutes a violation of 21 U.S.C. § 842(a)(5),[3] and subjects the offender to

**2.** The statute sets forth exceptions that are not applicable here.

**3.** Section 842(a)(5) provides: "It shall be unlawful for any person ... to refuse or fail to make,

keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter or subchapter II of this chapter[.]" 21 U.S.C. § 842(a)(5).

civil or penal penalties, depending on whether the act was committed knowingly. *Id.* § 842(c). "Inadvertent" mistakes due to sloppy recordkeeping subject pharmacies and owners to fines; a "knowing" violation subjects them to criminal sanctions of imprisonment, fines, or both.

In tone and tenor, the Act's recordkeeping provisions mirror other food and drug legislation that Congress has enacted. The Supreme Court has upheld strict liability prosecutions under such statutes, where legislative history has provided for strict regulation.

Illustrative is *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922), where the defendants were indicted for violating the Narcotic Act of 1914, which made it unlawful "for any person to sell, barter, exchange, or give away" certain drugs. Act of Dec. 17, 1914, ch. 1, § 2, 38 Stat. 785, 786 (repealed 1939). The district court dismissed the indictment because it did not charge that the defendants knew the drugs to be illegal, even though the law did not specifically make such knowledge an element of the offense. The Supreme Court reversed.

"[I]n the prohibition or punishment of particular acts," the Court reasoned, the legislature may "in the maintenance of a public policy provide 'that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance.'" *Id.* at 252, 42 S.Ct. at 302 (quoting *Shevlin–Carpenter Co. v. Minnesota,* 218 U.S. 57, 70, 30 S.Ct. 663, 666–67, 54 L.Ed. 930 (1910)). The Court noted examples found in regulatory measures in the exercise of the government's police power where the underlying purpose of the statute is centered on the advancement of some social purpose rather than the punishment of the crime.

In *Balint,* the Court determined that the congressional purpose of the Narcotic Act was "to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he sells the inhibited drug in ignorance of its character, to penalize him." *Id.* 258 U.S. at 254, 42 S.Ct. at 303. With respect to the traditional rule making scienter a requisite element of every crime, the Court declared that there is a modification of this rule where the purpose of the statute would be obstructed by such a requirement.[4]

Later, in 1943, the Supreme Court adopted a similar analysis in *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), involving a conviction under a provision of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331(a). The law imposed misdemeanor penalties for "[t]he introduction or delivery for introduction into interstate commerce of any food [or] drug ... that is adulterated or misbranded." *Id.* The Court upheld the conviction, with Justice Frankfurter writing:

> The prosecution to which Dotterweich was subjected is based on a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.

*Dotterweich,* 320 U.S. at 280–81, 64 S.Ct. at 136.

In determining the central issue in *Dotterweich*—whether the Act's penal sanctions could be levied against corporate officers—the Court examined the legislative history of the law, which revealed the con-

---

4. The Supreme Court relied on *Balint* to explain the justification for the heightened standard of liability under pure food legislation:

> The usual rationale for such statutes is that the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors—in fact an *absolute standard* which will not hear

the distributor's plea as to the amount of care he has used. Cf. *United States v. Balint,* 258 U.S. 250, 252–253, 254, 42 S.Ct. 301, 302, 303. His ignorance of the character of the food is irrelevant.

*Smith v. California,* 361 U.S. 147, 152, 80 S.Ct. 215, 218, 4 L.Ed.2d 205 (1959) (emphasis added) (dictum).

gressional desire to "enlarge and stiffen the penal net" for the distribution of misbranded or adulterated drugs. *Id.* at 282, 64 S.Ct. at 137.

On initial scrutiny, the recordkeeping provisions of the Controlled Substances Act, like the provisions of the statutes reviewed in *Balint* and *Dotterweich,* appear to fall within the "expanding regulatory area involving activities affecting public health, safety, and welfare," where it need not be shown that the alleged offender committed a willful violation. *United States v. Freed,* 401 U.S. 601, 607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971). The defendants, of course, urge a narrow reading—that because the Act does not specifically describe strict liability, it cannot be imposed. On this point, we are guided by the Supreme Court's statement that, in construing even criminal statutes,

> The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose.... Nor does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their meaning in accord with the manifest intent of the lawmakers.

*United States v. Brown,* 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948) (citations omitted), *quoted in United States v. Moore,* 423 U.S. 122, 145, 96 S.Ct. 335, 347, 46 L.Ed.2d 333 (1975).

Thus, as did the Supreme Court in *Balint* and *Dotterweich,* we must look to the legislative history of the governing law to determine if Congress intended strict regulation.

### III.

Our starting point is, of course, the text of the statute itself, which plainly shows an absence of the scienter requirement for civil violations of the recordkeeping provisions. The mere failure or refusal to comply with the recordkeeping requirements is a violation of 21 U.S.C. § 842(a)(5), a civil offense subjecting the offender to a maximum penalty of $25,000, 21 U.S.C. § 842(c)(1). On the other hand, one who is charged with, and found to have committed, a "knowing[ ]" violation of section 842(a)(5) is subject to a criminal sanction of imprisonment of up to one year or a fine of not more than $25,000, or both, for the first offense. *Id.* § 842(c)(2)(A).[5] Congress, therefore, plainly differentiated between civil and criminal violations of the recordkeeping provisions, implementing notably different standards of fault.

To determine whether Congress sought to regulate strictly the recordkeeping of drug inventory requires a broader examination of the accompanying legislative materials. The recordkeeping provisions of the Act are but a part of the comprehensive legislation enacted to combat the growing problem of drug abuse and drug trafficking in the United States. H.R.Rep. No. 1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4566, 4567. Indeed, the opening provisions of the statute offer a legislative finding that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2).

---

**5.** Section 842(c), the penalty provision, reads in relevant part:

(1) Except as provided in paragraph (2), any person who violates this section shall, with respect to any such violation, be subject to a civil penalty of not more than $25,000....
(2)(A) If a violation of this section is prosecuted by an information or indictment which alleges that the violation was committed knowingly and the trier of fact specifically finds that the violation was so committed, such person shall, except as otherwise provided in subparagraph (B) of this paragraph, be sentenced to imprisonment of not more than one year or a fine of not more than $25,000, or both.

(B) If a violation referred to in subparagraph (A) was committed after one or more prior convictions of the offender for an offense punishable under this paragraph (2), or for a crime under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 2 years, a fine of not more than $50,000, or both.
21 U.S.C. § 842(c)(1), (2).

The legislative history reveals congressional concern to reduce the diversion of drugs from the legitimate course of commerce into illegal channels. 116 Cong.Rec. 996 (1970) (statement of Sen. Dodd). Congress thus sought measures to monitor the drug transactions of registrants, who, with authority to dispense drugs, have the greatest access to controlled substances, and therefore, the greatest opportunity for diversion. *See United States v. Moore*, 423 U.S. 122, 135, 96 S.Ct. 335, 342, 46 L.Ed.2d 333 (1975). *See also* 1970 U.S.Code Cong. & Admin.News at 4569. Moreover, the Act was crafted to "continue[ ], and strengthen[ ]" then existing laws regarding recordkeeping and inventory. *Id.* at 4590. As to the recordkeeping provisions specifically, Senator Griffin commented:

Other features of the bill aim at preventing diversion by *requiring strict recordkeeping.* Those who handle or manufacture controlled dangerous substances, with few exceptions, are required to maintain detailed records of receipts and disbursements.... Failure either to keep the records or make them available for inspection will subject the violator to severe penalties including forfeiture of his supply of controlled dangerous drugs.

A new recordkeeping feature added by the bill is the requirement for an inventory of all controlled dangerous substances at least once every 2 years. This seemingly simple provision should prove to be a valuable aid in stopping diversion before it gets out of hand.... Subsequent *drug accountability audits will not deal in approximations, but rather in very precise figures.*

116 Cong.Rec. at 998 (statement of Sen. Griffin) (emphases added).

Thus, a reading of the statutory text and history makes clear that Congress intended strict compliance with the recordkeeping provisions, with strict liability to attach for civil violations. On this issue, the disposition of the district court is correct in all respects.

We find further support in the analysis of the strict liability statute we utilized in *United States v. Engler*, 806 F.2d 425 (3d Cir.1986), *cert. denied*, 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987). The defendants in *Engler* were charged with unlawfully selling protected wildlife in violation of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703, 707(a), (b). We relied on the teachings of *Freed* and *Dotterweich* to uphold the strict liability provisions of the MBTA, over objection that the statute's lack of a scienter requirement failed due process protections.[6]

It is important to emphasize that in the present case, the government commenced a civil action against the pharmacy and the owner seeking fines, unlike *Balint, Dotterweich*, and *Engler*, which involved severe criminal sanctions as well as constitutional challenges to the mode of liability. Those cases present stronger (yet failed) arguments against the statutory strict liability scheme than what is made in this appeal.

The defendants further argue that the result we enunciate here would allow the government to hold virtually any pharmacy liable for the most minor infraction even where the greatest care has been exercised and good faith demonstrated. This is a consequence that Congress likely accepted in enacting the Act,[7] and perhaps should be considered together with the broad discretion the district court has in assessing fines. In any event, the shortages of the tablets in the present case were not insignificant, and the principles set forth in *Dot-*

---

6. Congress has since amended 16 U.S.C. § 707(b) to require that the offender act "knowingly." Emergency Wetlands Resources Act of 1986, Pub.L. No. 99–645, § 501, 100 Stat. 3582, 3590.

7. In *Dotterweich*, the Supreme Court addressed a similar consequence of hardship under the Federal Food, Drug, and Cosmetic Act, stating:

Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting. Balancing relative hardships, Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless.

*Dotterweich*, 320 U.S. at 284–85, 64 S.Ct. at 138.

*terweich* require that we heed the congressional mandate providing for strict accountability of drug inventory.

IV.

For the aforementioned reasons, the judgment of the district court will be affirmed.