**UNITED STATES of America Plaintiff,**

v.

**GRAB BAG DISTRIBUTING and Rodney G. Nickerson, Defendants.**

**No. CIVF006132OWWSMS.**

United States District Court, E.D. California.

Feb. 15, 2002.

---

Michael A. Hirst, Esq., United States Attorney, Sacramento, for plaintiff.

Stephen Solano, Esq., Modesto, for defendant.

## MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WANGER, District Judge.

### I. INTRODUCTION

The United States of America ("Plaintiff" or the "Government") sues defendants Grab Bag Distributing and Rodney G. Nickerson ("Defendants") for penalties and injunctive relief under the Drug Abuse Prevention and Control Act, 21 U.S.C. §§ 801–971 (the "Controlled Substances Act" or the "Act"). *See* Doc.13, Memorandum in Support, filed September 28, 2001, at p.1. Plaintiff moves for summary judgment on the issue of Defendants' liability. *See* Doc.12, Motion for Summary Judgment, filed Sept. 28, 2001. Defendants oppose the motion. *See* Doc.17, Memorandum in Opposition, filed Dec. 3, 2001. Oral argument was heard on January 7, 2002.

### II. BACKGROUND

At times relevant to the complaint, Defendants Grab Bag Distributing and its owner Rodney Nickerson were engaged in a wholesale distribution business, and as part of that business they sold pseudoephedrine. *See* Doc.8, Scheduling Order, filed Nov. 13, 2000. The Government alleges that between October 1997 and April 1998, Defendants sold extraordinary quantities of pseudoephedrine, a chemical used to manufacture methamphetamine. *See* Doc.13 at p.2. Defendants admit selling over 31,750 bottles of pure pseudoephedrine representing a total of over 114,000,-000 milligrams, or 114 kilograms, of pseudoephedrine. *See* Doc.17 at p.4; Doc.13 at p.2 and Exh. A ("Government's Exhibit A" or "Exhibit A"). These sales were made

to eight small convenience stores[1] in and around Modesto and Stockton, California. *See id.* Defendants were paid over $76,300 for these pseudoephedrine sales. *See id.* The amount of pseudoephedrine sold to these stores could be used to manufacture an estimated 200 pounds of methamphetamine with a street value in excess of $1,000,000. *See* Doc.13 at p.2. Defendants did not report these sales to the DEA. *See* Doc.17 at p.5:10–16. Defendants did not obtain signatures or driver's licenses from any of its purchasers. *See id.* at p.5:18–25. Defendants assert they obtained another form of identification from each purchaser listed in Exhibit A. *See id.*

Nickerson admits law enforcement officers told him as early as 1995 that large quantities of pseudoephedrine could be used to manufacture methamphetamine. *See* Doc.17 at p.6:7–8. Nickerson was aware since 1995 or 1996 of the need to report suspicious transactions. *See id.* at p.7:13–17. In 1996, well before any of the sales at issue here, Nickerson started getting calls from individuals not affiliated with any store or business who wanted to buy pseudoephedrine from him. Nickerson suspected these people did not want the product for legitimate reasons but instead might be "dirty." *See id.* at p.6:11–18. Nickerson continued to sell the product in 1996. His combined sales in 1995–96 were $420,000, 60–80% of which was attributable solely to the sale of pseudoephedrine. *See id.* at p.6:20–25.

Nickerson completed a questionnaire regarding his sales in 1997. In the letter accompanying the questionnaire, the DEA advised Nickerson that if he had any questions, he should call Diversion Investigator Ben Vinson in Sacramento. Vinson's number was listed in the letter. Nickerson never called Vinson for information on compliance with the law. *See id.* at p.7:19–p.8:5.

The government contends Defendants sold an "extraordinary" quantity of pseudoephedrine to the eight convenience stores mentioned in the Complaint. *See* Doc.13 at p.5:24–28. The Government asserts its sales were over 53 times what a convenience store would expect to purchase based on 1997 Economic Census data. *See id.* Defendants deny they sold an extraordinary quantity of pseudoephedrine to the stores in Exhibit A or that its sales were 53 times what a convenience store would expect to purchase. *See* Doc.17 at p.5:5–8.

### III. *LEGAL STANDARD*

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *see California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in light most favorable to the nonmoving party. *See Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).. If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins.*

---

1. The stores are Ashourbon Market and C & V Market in Modesto; Cherokee Market, Orlando's Markets, and Waterloo Liquors in Stockton; El Rancho Market in Salida; Matty's Market in Turlock; and Sierra View Liquor in Escalon. *See* Doc.17 at Exh. A. Defendant Nickerson testified in his deposition that each of the eight stores was "small." *See* Doc.14, Nickerson Depo., at p.49:1–p.66:6.

*Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1107 (9th Cir.2000). Instead, the nonmoving party, through affidavits or other admissible evidence, "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P 56(e).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

Evidence submitted in support of, or in opposition to, a motion for summary judgment must be admissible under the standard articulated in 56(e). Properly authenticated documents can be used in a motion for summary judgment if appropri-ately authenticated by affidavit or declaration. *See Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550–51 (9th Cir.1989). Supporting and opposing affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show that the affiant is competent to testify to the matters stated therein. *See* Fed.R. Civ.P. 56(e).

## IV. *ANALYSIS*

Plaintiff argues no material facts regarding Defendants' liability are in dispute. *See* Doc.13 at p.1. Plaintiff argues the undisputed evidence shows Defendants committed 366 violations of the Act by failing to obtain identification from their purchasers and by failing to report suspicious sales to the Drug Enforcement Administration (the "DEA"). *See id.*

> The Controlled Substances Act provides:
>
> It is the duty of each regulated person who engages in a regulated transaction to identify each other party to the transaction. It is the duty of such other party to present proof of identity to the regulated person. The Attorney General shall specify by regulation the types of documents and other evidence that constitute proof of identity for purposes of this paragraph.

21 U.S.C. § 830(a)(3). "For sales to individuals or cash purchasers, the type of documents and other evidence of proof must consist of at least[:][1] a signature of the purchaser, [2] a driver's license and [3] one other form of identification." 21 C.F.R. § 1310.07(d).

The regulated person must report to the Attorney General "any regulated transaction involving an extraordinary quantity of a listed chemical, an uncommon method of payment or delivery, or any other circumstance that the regulated person believes may indicate that the listed chemical will

be used in violation of this title." 21 U.S.C. § 830(b)(1)(A). "Each report under subparagraph (A) shall be made at the earliest practicable opportunity after the regulated person becomes aware of the circumstance involved." 21 U.S.C. § 830(b)(1).

A "regulated person" is one "who manufactures, distributes, imports, or exports a listed chemical." 21 U.S.C. § 802(38). "The term 'distribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical." 21 U.S.C. § 802(11). To "deliver" means "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." 21 U.S.C. § 802(8). A "listed chemical is "any list I chemical or any list II chemical.'" 21 U.S.C. § 802(33). Pseudoephedrine is a list I chemical. *See* 21 U.S.C. § 802(34)(K).

A "regulated transaction" is "a distribution, receipt, sale, importation, or exportation of ... a listed chemical, or if the Attorney General establishes a threshold amount for a specific listed chemical, a threshold amount, including a cumulative threshold amount for multiple transactions ..., of a listed chemical." 21 U.S.C. § 802(39). "[T]he quantitative threshold or the cumulative amount for multiple transactions within a calendar month, to be utilized in determining whether a receipt, sale, importation or exportation is a regulated transaction is" one kilogram for pseudoephedrine. 21 C.F.R. 1310.04(f).

### A. *Failure to Identify Purchasers*

■ Defendants admit to distributing pseudoephedrine, a listed chemical. *See* Doc.17 at p.4; Doc. 8. As such, they are "regulated persons" under 21 U.S.C. § 802(38). Defendants admit selling pseudoephedrine as described in Exhibit A. *See* Doc. 17 at p.4; Exh. A (describing each

purchase as a "cash transaction"). In each of the months for which sales are reported in Exhibit A, the quantity of pseudoephedrine sold to each convenience store exceeds the one kilogram threshold. *See* Exh. A; 21 U.S.C. § 802(39); 21 C.F.R. 1310.04(f). As regulated persons engaged in regulated transactions, Defendants had a duty to identify each purchaser of pseudoephedrine by "at least a signature of the purchaser, a driver's license *and* one other form of identification." 21 C.F.R. § 1310.07(d) (emphasis added); *see also* 21 U.S.C. § 830(a)(3). Defendants did not obtain signatures or driver's licenses from any of its purchasers. *See* Doc.17 at p.5:18–25. Defendants argue they obtained each store owner's name and tax resale number and could identify their purchasers by sight. *See id .* at p.5:18–25, pp.15–16. Even if Defendants obtained another form of identification from each purchaser listed in Exhibit A, they breached their statutory duty in not also obtaining signatures and driver's licenses.

Defendants argue the Act "imposes no duty on the regulated person to obtain proof of identity." Doc. 17 at p.16:10. The Act is unambiguous: "It shall be unlawful for any person ... who is a regulated person to engage in a regulated transaction without obtaining identification required by [21 U.S.C. § 830(a)(3) ]." 21 U.S.C. § 842(a)(9). Defendants were regulated persons engaged in regulated transactions. They had a statutory duty to obtain identification in the form of signatures and driver's licenses from their purchasers. The undisputed facts show that Defendants breached that duty.

■ Defendants argue that not every sale listed in Exhibit A is a "regulated transaction." *See* Doc.17 at p.10. The Government argues every sale listed in Exhibit A is a "regulated transaction." *See* Doc.18 at p.17. Only those transactions

made at or in excess of the allowable monthly amount qualify as "regulated transactions." *See* 21 U.S.C. § 802(39). Were the statute construed as the Government argues it should be, regulated persons would be retroactively liable for not obtaining identification during a sale after unexpectedly selling more of a listed chemical to the same customer later in the month, even if the regulated seller obtained the proper identification during the later transaction. Such an interpretation contradicts the plain meaning of the Act and defies common sense.

The threshold monthly amount for pseudoephedrine is one kilogram. 21 C.F.R. 1310.04(f). Only transactions which elevate Defendants' monthly pseudoephedrine total sold per customer to a level at or over one kilogram are "regulated transactions" subject to the Act's identification requirements. According to Exhibit A, most transactions involved lots of 144 bottles, each bottle containing 60 tablets, and each tablet containing 60 milligrams of pseudoephedrine. *See* Exh. A. Such a lot comprises 518,400 milligrams, or 0.5184 kilograms, of pseudoephedrine. The second such lot sold in the same calendar month would raise the monthly total to 1.0368 kilograms. This total exceeds the allowable monthly total of 1 kilogram. The second sale of a 0.5184 kilogram lot and any subsequent sales made in the same month to the same customer are "regulated transactions" subject to the identification requirements.[2]

For all sales except those to Orlando's Market, the second sale of each reported month and all subsequent sales are "regulated transactions," a total of 116 regulated transactions. The sales to Orlando's Market were all each over 1 kilogram. The minimum lot sold to Orlando's Market at any one time was 288 bottles of sixty 60–milligram tablets. *See* Exh. A. These lots contained 1.0368 kilograms of pseudoephedrine each. 31 transactions with Orlando's Market are listed in Exhibit A. In all, Defendants were involved in 147 regulated transactions to which the Act's identification requirements applied. Defendants violated their statutory duty in all 147 instances. The Government's motion for summary judgment as to Defendants' liability for failure to obtain the required identification for 147 regulated transactions is GRANTED.

**B.** *Failure to Report Suspicious Transactions*

The Government argues Defendants failed to comply with 21 U.S.C. § 830(b)(1), which requires regulated persons to report to the Attorney General "any regulated transaction involving an extraordinary quantity of a listed chemical, an uncommon method of payment or delivery, or any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of this title ... at the earliest practicable opportunity after the regulated person becomes aware of the circumstance involved." 21 U.S.C. § 830(b)(1).

The Government presents evidence supporting its contention that Defendants sold "extraordinary" quantities of pseudoephedrine. Jonathan Robbin, an expert in statistical analysis, declares Defendants' sales of pseudoephedrine as documented in Exhibit A are over 53 times the amount nor-

---

**2.** Exhibit A includes asterisks besides dates which purportedly represent the point in the month at which cumulative sales exceed threshold requirements. *See* Exh. A. It is unclear why, in most cases, asterisks are not placed at earlier dates. For example, the asterisk for the October sales to Cherokee Market is placed next to the third transaction, but the one kilogram threshold was exceeded in the second transaction after which the total pseudoephedrine sold in October was 1.0368 kilograms. *See id.*

mally expected to be sold. *See* Doc.13, Exh. F, Robbin's Affidavit, ¶ 19. He concludes Defendants' sold "pseudoephedrine in extraordinary quantities." *See id.* at ¶ 20. Robbin's supports his expert opinion with a detailed statistical analysis involving 1997 Economic Census Data. *See id.*

Benjamin Vinson, a senior diversion investigator with the Drug Enforcement Agency ("DEA") declares that in his experience the type of small convenience stores identified as purchasers in Exhibit A do not sell pseudoephedrine to legitimate customers in the quantity sold to them by Defendants. *See* Doc.13, Exh. G, Vinson's Affidavit, ¶ 8. Photographs taken by Vinson and Nickerson's deposition support the conclusion that the convenience stores were small and unlikely candidates for selling large quantities of pure pseudoephedrine to legitimate customers. *See id.* at Exhs. 1–9; Nickerson Depo. at p.49:1–p.66:6.

Lorne Skinner, the president of a leading pharmaceuticals distributor to convenience stores, declares convenience stores such as those identified in Exhibit A do not typically sell large quantities of nonprescription drugs to consumers. *See* Doc.13 at Exh. H, Skinner's Affidavit, ¶ 5. Based on his 24 years of experience in the retail and distribution industry, Skinner's opinion is that Defendants' "sales of pseudoephedrine and the frequency of those sales, as shown in Exhibit A, are excessive for any [over-the-counter] product-whether pseudoephedrine or another type of OTC product-to convenience stores of this size." *Id.*

The undisputed facts reveal other unusual circumstances surrounding Defendants' sales. All of the purchases were made with cash. *Cf. United States v. Akhtar*, 95 F.Supp.2d 668, 672 (S.D.Tex.1999) (describing a defendant's admission that four ephedrine transactions "were unusual because they were made in cash and be-

cause they were for progressively larger quantities of ephedrine."). Common sense suggests such "an uncommon method of payment," *see* 21 U.S.C. § 830(b)(1), renders the sales suspicious. *See also* Vinson's Affidavit at ¶ 10 ("all of the stores paid cash (generally $345.60 each week) to Grab Bag for the pseudoephedrine, suggesting the suspicious nature of the sales"). The fact that the pseudoephedrine was sold in pure form is another suspicious circumstance surrounding the transactions. *See* Skinner's Affidavit at ¶ 6 (describing pure pseudoephedrine as "a 'fringe product,' a legal but suspicious item in that the product was often used in a non-medical manner"). The Act defines "ordinary over-the-counter pseudoephedrine" as being "sold in package sizes of not more than 3.0 grams of pseudoephedrine base ... and ... packaged in blister packs." 21 U.S.C. § 802(45). Defendants sold pseudoephedrine in packages of 3.6 grams (each bottle containing 60 tablets at 60 milligrams each), and the pseudoephedrine was packaged in bottles, not blister packs. *See* Exh. A. The pseudoephedrine did not meet the Act's definition of "ordinary over-the-counter pseudoephedrine" and was subject to suspicion.

■ Defendants argue that no particular transaction involved an "extraordinary amount" of pseudoephedrine. *See* Doc.17 at p.12:6–8. Defendants argue the Act does not ask whether sales in the aggregate are extraordinary, but whether particular "regulated transactions" involve extraordinary quantities. *See id.* at p.12:12–15. The type of "regulated transaction" at issue here is "the cumulative amount for multiple transactions within a calendar month." 21 C.F.R. 1310.04(f); *see also* 21 U.S.C. § 802(39). Even under Defendants' construction, an entire "regulated transaction" consisting of multiple individual sales is considered in determining whether the to-

tal amount of pseudoephedrine sold in any month is "extraordinary." An evaluation of the amount of pseudoephedrine sold to the convenience stores in particular months reveals that the quantities sold were extraordinary.

Defendants argue that the amount of pseudoephedrine sold could not be extraordinary because a County Drug Enforcement Agent, Steve Hoeck, implicitly found nothing unlawful or suspicious about selling as many as two cases per week per customer. *See* Doc.17 at p.13:1–10. In June 1996, Hoeck told Nickerson there were no violations involved, but that "he needed to be cautious of suspicious orders." *See id.;* Nickerson Depo. at pp.33–34. Any statements allegedly made by Hoeck are not relevant to whether the quantities of pseudoephedrine sold in 1997 and 1998 were "extraordinary" under the Act. Hoeck has not been qualified as an expert in federal law, nor is his advice relevant. The Act's provisions regarding pseudoephedrine as they bear on this litigation were not enacted until October of 1996. *See* 21 U.S.C.S. § 802. Hoeck could not have advised Nickerson as to his liability under the Act even if he purported to do so. Finally, Hoeck reported that Nickerson was "aware of problems" and "was concerned that he was doing something illegal," two statements which contradict Defendants' argument they did not believe they were doing anything suspicious. Hoeck's statements to Nickerson do not create a factual dispute as to the amount of pseudoephedrine sold. The quantities, dates, purchasers, and manner of the sales are not facts in dispute. *See* Doc.17 at p.4:3–11. Whether or not this amount of pseudoephedrine is "extraordinary" as a matter of law does not depend on any statements by Hoeck.

Defendant Nickerson argues he never subjectively believed any of his sales were of extraordinary quantities of pseu-doephedrine. *See* Doc.17 at p.13:11–p.14:7. Defendants argue the reporting requirement of 21 U.S.C. § 830(b)(1) is not triggered unless a regulated person "becomes aware of the circumstances involved." 21 U.S.C. § 830(b)(1). 21 U.S.C. § 830(b)(1)(A) requires a regulated person to report to the Attorney General "any regulated transaction involving an extraordinary quantity of a listed chemical, an uncommon method of payment or delivery, or any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of this title." 21 U.S.C. § 830(b)(1)(A). The statute specifies: "Each report under subparagraph (A) shall be made at the earliest practicable opportunity after the regulated person becomes aware of the circumstance involved." 21 U.S.C. § 830(b)(1). Defendants argue the subjective "becomes aware of" requirement applies to all of subparagraph (A). The Government argues the "becomes aware of" does not import a subjective standard into all of subparagraph (A). The Government argues a subjective standard applies only to subparagraph (A)'s catch-all provision ("or any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of this title"), and not to the provisions requiring reporting in situations involving extraordinary quantities or uncommon methods of payment or delivery. *See* Doc.18 at p.14:3–p.16:26. In other words, the Government argues 21 U.S.C. 830(b)(1)(A)'s reporting requirements with respect to extraordinary quantity and uncommon method of payment are strict liability provisions for which liability may attach without regard to fault. *See* Doc.13 at p.14. Defendants argue they can be held liable under 21 U.S.C. 830(b)(1)(A) only if they subjectively became aware of the extraordinary quantity, uncommon payment or delivery method, or other un-

usual circumstance and subjectively believed the quantity involved was extraordinary, the payment method was uncommon, or the other circumstance was unusual. *See* Doc.17 at p.13:11–p.14:7.

At the time of the sales in question, the Act provided that "[i]t shall be unlawful for any person ... to refuse or fail to make, keep, or furnish any record [or] report ... under this title ... [or] to fail to keep a record or make a report under [21 U.S.C. § 830]." 21 U.S.C. § 842(5) & (10) (1997). In 1998, the statute was amended. It now provides that "[i]t shall be unlawful for any person ... to refuse or *negligently* fail to make, keep, or furnish any record [or] report ... under this title ... [or] *negligently* to fail to keep a record or make a report under [21 U.S.C. § 830]." 21 U.S.C. § 842(5) & (10) (emphases added). Prior to the 1998 amendment, strict liability attached to civil violations of 21 U.S.C. § 842(a)(5). *See United States v. Green Drugs,* 905 F.2d 694, 698–99 (3rd Cir. 1990); *United States v. Little,* 59 F.Supp.2d 177, 183 (D.Mass.1999); *United States v. Poulin,* 926 F.Supp. 246, 250–51 (D.Mass.1996). In *Little,* the court applied the strict liability standard to pre-amendment offenses rather than retroactively applying the new negligence standard. *See Little,* 59 F.Supp.2d at 182–83. The Government argues that *Little* supports applying strict liability under 21 U.S.C. § 842(a)(5) & (10) to Defendants' violations which all occurred prior to the October 21, 1998, amendment of the Act. *See* Doc.13 at pp.12–13. Defendants do not dispute that section 842 should apply as it existed prior to the 1998 amendments when the alleged violations occurred.

*Green Drugs, Little,* and *Poulin* all involved underlying violations of 21 U.S.C. § 827, the requirement that registered manufacturers, distributors, and dispensers of controlled substances keep certain records and make reports to the Attorney General. Section 827 contains no language suggesting a subjective element. The allegations here concern violations of section 830(b)(1) which does contain language suggesting a subjective element. Even if Defendants are "strictly liable" under section 842(5) & (10) for violations of section 830(b)(1), they still must be liable under section 830(b)(1) before penalties may be imposed under section 842(10).

The subjective element in section 830(b)(1) is that reports under section 830(b)(1)(A) are due as soon as "the regulated person becomes aware of the circumstance." 21 U.S.C. 830(b)(1). The circumstances alleged are "an extraordinary quantity" of pseudoephedrine, cash as the exclusive method of payment, and the pure form in which the drug was sold. While the last circumstance requires that Defendants subjectively believed the pure form may indicate the pseudoephedrine would be used in violation of the Act, the first two circumstances are explicitly mentioned in the statute and do not require that Defendants subjectively believed the extraordinary quantity or cash method of payment indicated an illegal use of the pseudoephedrine. *See* 21 U.S.C. § 830(b)(1)(A). All that is required for a report to be due to the Attorney General is that Defendants "become[ ] aware" that they sold an extraordinary amount of pseudoephedrine or were paid in an uncommon manner. *See id.* Whether or not Defendants believed the amount or method of payment indicated illegal use of the drug is not relevant.

Nor is it relevant whether Defendants subjectively believed the amounts were "extraordinary" or the method of payment "uncommon." Whether the amounts were extraordinary or the method of payment uncommon are determined using an objective, not subjective, standard. If a subjective standard were intended, the statute

would specify that reports are required when the regulated person is involved in a transaction involving an amount of a listed chemical *he believes* is extraordinary or a transaction involving a method of payment *he believes* is uncommon. The statute does specify such a requirement in its catch-all category. *See* 21 U.S.C. § 830(b)(1)(A) ("or any other circumstance that the regulated person believes may indicate the listed chemical will be used in violation of this title"). Section 830(b)(1)(A) is not so worded with respect to "extraordinary quantity" and "uncommon method of payment." The absence of any suggestion in the regulations that the "becomes aware of" provision is anything more than a guide as to the timing of required reporting reinforces the conclusion that "extraordinary quantity" and "uncommon method of payment" are determined objectively without reference to the regulated person's subjective beliefs about whether a quantity was extraordinary or a payment method uncommon. *See* 21 C.F.R. § 1310.05.

Defendants present no evidence other than Nickerson's subjective statements that he did not believe the quantity of pseudoephedrine involved was not extraordinary.[3] Nickerson's subjective beliefs are not relevant in this objective determination. The undisputed evidence shows that the quantity of pseudoephedrine sold to the convenience stores in the regulated transactions was extraordinary as prescribed by applicable federal regulations.

This statutory presumption is not rebutted by any other evidence. Defendants knew of the extraordinary quantity sold because Nickerson was personally involved in selling the drugs to each purchaser. *See, e.g.,* Nickerson Depo. at p.52:17–20; p.10:13–21. No rational trier of fact could find that Defendants were not obligated under 21 U.S.C. § 830(b)(1) to report the 147 regulated transactions to the Attorney General.

Nickerson admits law enforcement officers told him as early as 1995 that large quantities of pseudoephedrine could be used to manufacture methamphetamine. *See* Doc.17 at p.6:7–8; Nickerson Depo. at pp.68–69, p.17:19–p.19:19. Defendants previously sold pseudoephedrine that was subsequently found in a methamphetamine laboratory dump site. *See* Doc.18 at p.10; Vinson's Affidavit at ¶¶ 4–5. In September of 1998, Nickerson withdrew his application to sell pseudoephedrine, writing in a letter to the DEA, "I am declining this application because of the fact that I have no control over where the products go after I sell them to a retail store.... With the large number of drug busts, I find it hard to believe that they are abiding by the law in many instances." *See* Doc.13 at Exh. K. Nickerson knew as early as 1995 he needed to report suspicious sales. *See* Nickerson Depo. at p.122:2–25. Although not required for liability under section 830(b)(1), the evidence strongly indicates Defendants subjectively believed they were engaged in suspicious sales of pseu-

---

**3.** In a letter received January 11, 2002, Defendant Nickerson argues the convenience stores sold large quantities of his pseudoephedrine because it was 75–80% cheaper than the name brands. *See* Nickerson Letter, received January 11, 2002. "When the public found out that they could buy a 60 count bottle of pseudoephedrine pills 60 mgs,ea. for less than they could buy a 10 or 15 count blister pack of a national brand such as Sudafed or Actifed....they started coming into the stores in droves to buy them." *Id.* at p.2.

In addition to the untimely nature of this assertion, Nickerson's argument is not in itself evidence and is unaccompanied by store receipts, expert testimony, customer declarations, or any other evidence. Nickerson concedes in his letter that "[s]ome of the reasons [consumers] buy [pure pseudoephedrine] are not recommended by the manufacturer, but how can you stop them?" Nickerson Letter at p.2. The Act's regulation of suspicious sales aims to prevent such illicit uses.

doephedrine which required compliance with the Act. Nickerson voluntarily chose to operate a high-risk business that was subject to affirmative reporting requirements.

The Government's motion for summary judgment as to Defendants' liability for 147 violations of 21 U.S.C. § 830(b)(1) is GRANTED. Combined with Defendants' 147 violations for failing to obtain proper identification from purchasers, summary judgement is granted as to liability for 294 violations of the Act.

### V. *CONCLUSION*

Plaintiff's motion for summary judgment is GRANTED as to Defendants' liability for 294 violations of the Act. Within five (5) days following service of this decision, Plaintiff shall submit an order in conformity with this decision to be signed by the court.

SO ORDERED.