**ADVANCE PHARMACEUTICAL, INC.,**
Tasrin Hossain, and Liaquat Hossain,
Defendants–Appellants,

v.

**UNITED STATES of America,**
Plaintiff–Appellee.

No. 02–6233.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 26, 2003.

Decided: Dec. 3, 2004.

Jeffrey A. Badner, Mauro Goldberg & Lilling LLP, Great Neck, New York, for Defendants–Appellants.

Elliot M. Schachner, Assistant United States Attorney (Deborah B. Zwany, Assistant United States Attorney, on the brief), for Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, Brooklyn, New York, for Plaintiff–Appellee.

Before: CALABRESI, B.D. PARKER, and RAGGI, Circuit Judges.

1. The Honorable Ivan L.R. Lemelle of the United States District Court for the Eastern District of Louisiana, sitting by designation.

2. On September 9, 2002, Advance Pharmaceutical filed its Notice of Appeal, appealing from the August 7, 2002 judgment. Thereafter, the district court issued an October 9,

RAGGI, Circuit Judge.

Defendants–Appellants Advance Pharmaceutical, Inc.; its president, Tasrin Hossain; and her husband and the corporation's vice-president, Liaquat Hossain, appeal from a judgment of the United States District Court for the Eastern District of New York (Ivan L.R. Lemelle, Judge[1]), entered on August 7, 2002,[2] which awarded the United States a $2 million monetary penalty and injunctive relief after a civil jury trial at which defendants were found to have repeatedly violated a provision of the Controlled Substances Act (the "Act") requiring manufacturers of pseudoephedrine tablets to report certain shipments to the Attorney General. See 21 U.S.C. § 830(b)(1)(A). Defendants submit that (1) the trial evidence was insufficient to support the jury's verdict; (2) the reporting requirements of § 830(b)(1)(A) are, in any event, unconstitutionally vague as applied to their case; and (3) the monetary and injunctive relief awarded by the district court was excessive. Because we reject each of these arguments as without merit, we AFFIRM the judgment of the district court.

## I. Regulatory Framework

### A. Statutory Reporting Requirements

Title 21 U.S.C. § 830(b)(1) requires a "regulated person," i.e., anyone who "manufactures, distributes, imports, or exports a listed chemical," id. § 802(38),

> [to] report to the Attorney General, in such form and manner as the Attorney General shall prescribe by regulation –

2002 order, see Final Order of Permanent Injunction, Payment Schedule and Modified Final Judgment, in which it elaborated, inter alia, on the payment of the monetary penalty and the enforcement of the injunctive relief that the court had previously awarded.

(A) any regulated transaction involving an extraordinary quantity of a listed chemical, an uncommon method of payment or delivery, or any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of this subchapter[,]

*id.* § 830(b)(1)(A). To satisfy the regulations implementing this reporting requirement, a regulated person must make an oral report to the local office of the Drug Enforcement Administration ("DEA") "at the earliest practicable opportunity after ... becom[ing] aware of the circumstances involved and as much in advance of the conclusion of the transaction as possible," followed by a written report within fifteen days thereafter. 21 C.F.R. § 1310.05(b).

The negligent failure to comply with § 830(b)(1)(A)'s reporting requirements constitutes a violation of 21 U.S.C. § 842(a)(10) and can be penalized civilly with a fine not in excess of $10,000 per violation. *See* 21 U.S.C. § 842(c)(1)(B). This represents a reduction, effective October 21, 1998, from the previous possible civil fine of up to $25,000 per violation. *See id.* § 842(c)(1)(B) (West 1997), *amended by* Pub.L. No. 105–277, § 101(b), 112 Stat. 2681, 2681–69 (1998).[3] Moreover, the earlier version of the statute identified no specific *mens rea* requirement for the imposition of civil penalties. *See id.* § 842(a)(10) (West 1997), *amended by* Pub.L. No. 105–277, § 101(b), 112 Stat. 2681, 2681–69 (1998).[4] In addition, 21 U.S.C. § 843(f)(1) authorizes the Attorney General to seek "appropriate ... injunc-tive relief relating to violations of ... section 842."

## B. *Regulated Pseudoephedrine Transactions*

The Controlled Substances Act lists pseudoephedrine as one of several chemicals that is subject to regulatory reporting because, in addition to having legitimate uses, for example, as an active ingredient in over-the-counter cold and allergy medicines, pseudoephedrine is used in the illicit production of controlled substances, notably methamphetamine. *See* 21 U.S.C. § 802(34)(K) (designating pseudoephedrine as "list I chemical"); *see also id.* § 812, Sched. II, (c) (listing any injectable liquid containing methamphetamine as a Schedule II controlled substance); *id.* § 812, Sched. III, (a)(3) (listing any other substance containing methamphetamine as a Schedule III controlled substance). *See generally* U.S. Dep't of Justice, DEA, Diversion Control Program Alert, *Methamphetamine: Preventing the Retail Diversion of Pseudoephedrine* (Aug.2003), *available at* http://www.deadiversion. usdoj.gov/pubs/brochures/pseudo/pseudo_ trifold.htm; *Comprehensive Methamphetamine Control Act of 1996: Hearing on H.R. 3852 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 104th Cong. 55–57 (1996) (statement of Harold D. Wankel, Chief of Operations, DEA) (describing use of pseudoephedrine products by illegal methamphetamine manufacturers). The Act exempts from the definition of a "regulated drug transaction," *see* 21 U.S.C. § 802(39)(A)(iv),

---

**3.** We note both versions of the statute because the jury found defendants liable for violations occurring both before and after October 21, 1998.

**4.** Under the current version of the Act, a "knowing" failure to comply with the report-ing requirements can also be punished criminally with a sentence of up to one year in prison for first-time offenders in addition to a $25,000 fine, and up to two years in prison for repeat offenders in addition to a $50,000 fine. *See* 21 U.S.C. § 842(c)(2)(A)-(B).

transactions in listed chemicals that are contained in drugs lawfully marketed and distributed in the United States under the Federal Food, Drug, and Cosmetic Act, *id.* § 301 *et seq.* Because this "'legal drug exemption'" became a "'loophole'" that was sometimes "'exploited by clandestine laboratory operators,'" H.R.Rep. No. 103–379, at 8 (1993) (quoting letter of Stephen H. Greene, Acting Administrator, DEA), *reprinted in* 1993 U.S.Code Cong. & Admin. News 2983, 2986, Congress enacted the Domestic Chemical Diversion Control Act of 1993, Pub.L. No. 103–200, 107 Stat. 2333 (1993), and the Comprehensive Methamphetamine Control Act of 1996 ("CMCA"), Pub.L. No. 104–237, 110 Stat. 3099 (1996), which revoked the exemption for drugs containing ephedrine and pseudoephedrine, *see* 21 U.S.C. § 802(39)(A)(iv)(I)(aa).[5] *See generally United States v. Daas,* 198 F.3d 1167, 1176 (9th Cir.1999); *Comprehensive Methamphetamine Control Act of 1996: Hearing on H.R. 3852 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 104th Cong. 36 (statement of Rep. Bill McCollum, Chairman, Subcomm. on Crime) (describing history of Congress's efforts to control precursor chemicals used to manufacture methamphetamine). The effective date for the inclusion of transactions in pseudoephedrine products was October 3, 1997. *See* CMCA § 401(g). All violations at issue in this case occurred after that date.

## II. *Factual Background*

At all times relevant to this action, Advance Pharmaceutical, a business operating out of Ronkonkoma, New York, manufactured and distributed, *inter alia,* pseudoephedrine in sixty-milligram tablets. At trial, law enforcement officials testified that such tablets, commonly sold in bulk quantities, are the dosage and form most often used by large-scale methamphetamine manufacturers. Although defendants sold their pseudoephedrine tablets to pharmaceutical wholesalers and distributors, law enforcement officials discovered evidence of over thirty-four million pseudoephedrine tablets originating with defendants at methamphetamine laboratories or dump sites. At trial, DEA officials testified that Advance Pharmaceutical was the pseudoephedrine manufacturer whose products were most often found in connection with such illegal activity.

Law enforcement witnesses from both the DEA and the California Bureau of Narcotic Enforcement ("CBNE") testified at trial that, on multiple occasions prior to the initiation of this enforcement action, they reviewed § 830(b)(1)(A)'s reporting requirements with defendants and detailed for defendants the evidence that large quantities of Advance Pharmaceutical's pseudoephedrine tablets had been diverted to criminal activities. Despite their receipt of this information, defendants never reported a single pseudoephedrine transaction to the DEA.

Because defendants argue on appeal that the evidence was insufficient to establish their violation of the statutory reporting requirements, we outline the relevant evidence in some detail.

---

5. The Act retains an exemption for sales of "ordinary over-the-counter pseudoephedrine ... products by retail distributors." 21 U.S.C. § 802(39)(A)(iv)(I)(aa). This creates a safe harbor for pseudoephedrine products sold in blister-packs at quantities up to 3.0 grams of pseudoephedrine base by a retail distributor, defined as, "a grocery store, general merchandise store, drug store, or other entity or person whose activities in sales of pseudoephedrine ... products are limited almost exclusively to sales for personal use ...." *Id.* § 802(45)-(46).

A. *Defendants' Unreported Shipments of Extraordinary Quantities of Pseudoephedrine Tablets to "New Customers"*

At trial, the government demonstrated a remarkable difference in the stipulated volume of pseudoephedrine shipments as between customers with whom Advance Pharmaceutical had a business relationship prior to October 31, 1997, and "new customers" with whom it began to deal after that date.

The "established customers," whose business the government used as a benchmark, included eleven companies to whom defendants supplied pseudoephedrine tablets between January 1, 1996, and October 31, 1997. *See* Trial Tr., July 17, 2001, at 13. Of these established customers, defendants provided the largest volume of pseudoephedrine tablets to Rugby Laboratories, Inc. ("Rugby"), a large, independent pharmaceutical distributor. Defendants' average shipment to Rugby contained approximately 500,000 sixty-milligram tablets of pseudoephedrine; only seven shipments to Rugby ever totaled more than one million tablets.

The nine "new customers" with whom Advance Pharmaceutical started doing business only after October 31, 1997, were Oralabs, Inc., a/k/a Top Form Brands, Inc. ("Top Form"); Interstate Vitamins, Inc. ("Interstate"); Assured Products Corp. ("Assured"); Oklatex Marketing, Inc. ("Oklatex"); Wildcat Wholesale Distributors, Inc. ("Wildcat"); HFO, Inc. ("HFO"); Pharmasales Corp. ("Pharmasales"); Maxx II, Inc. ("Maxx II"); and Seaside Pharmaceutical, Inc. ("Seaside"). *See id.* Between November 11, 1997, and April 26, 2000, defendants made 159 shipments to these new customers. The following table summarizes comparison evidence offered by the government to show that the volume of sixty-milligram pseudoephedrine tablets that Advance Pharmaceutical sold to these new customers greatly exceeded the volume that it sold during the same period to the largest established customer, Rugby.

*Figure 1: Comparison of Shipments to "New Customers" with Shipments to Rugby During Same Time Period*

| New Customer | Time Period | Number of Shipments | Total Number of Tablets | Total Number of Tablets to Rugby During Same Period |
|---|---|---|---|---|
| Interstate | 11/11/97—3/9/98 | 13 | 24,111,300 | 3,999,400 |
| Top Form | 11/18/97—12/1/99 | 57 | 240,705,220 | 31,533,700 |
| Assured | 3/20/98—4/21/98 | 12 | 12,004,120 | 661,000 |
| Oklatex | 4/15/98—6/18/98 | 6 | 14,515,200 | 3,821,000 |
| Wildcat | 7/10/98—4/20/99 | 26 | 47,938,560 | 10,285,600 |
| HFO | 2/8/99—4/26/00 | 18 | 20,391,780 | 2,904,200 |
| Seaside | 9/1/99—4/18/00 | 12 | 13,223,040 | 1,410,200 |
| Maxx II | 10/7/99—4/26/00 | 9 | 7,171,200 | 1,410,200 |
| Pharmasales | 11/29/99—4/20/00 | 6 | 6,181,920 | 1,410,200 |

In reviewing the comparison evidence for the jury, Katina Kypridakes, manager of CBNE's Precursor Compliance Program, testified that Advance Pharmaceutical's pseudoephedrine shipments to its new customers exceeded its shipments to Rugby by several multiples: three and one-half times (Oklatex), four times (Pharmasales), four and one-half times (Wildcat), five times (Maxx II), six times (Interstate),

seven times (Top Form and HFO), nine times (Seaside), and eighteen times (Assured).[6]

B. *Repeated Law Enforcement Notices to Defendants Regarding § 830(b)(1)(A)'s Reporting Requirements*

1. *December 2, 1997 Meeting with DEA Investigators*

DEA Investigator Stephen Buzzeo testified that, on December 2, 1997, he met with Liaquat Hossain at Advance Pharmaceutical's Ronkonkoma office. Buzzeo and his partner explained to Hossain that drug traffickers were using pseudoephedrine tablets to manufacture methamphetamine and that, in order to prevent this illegal use, the law imposed reporting requirements on manufacturers. Buzzeo specifically reviewed with Hossain the three circumstances when § 830(b)(1)(A) required Advance Pharmaceutical to pre-report its pseudoephedrine shipments to the DEA: (1) when the shipment was extraordinarily large; (2) when a customer requested an unusual method of delivery; and (3) when other circumstances indicated that the shipment was suspicious. To guide Hossain in complying with these requirements, Buzzeo explained that an extraordinarily large shipment was one that was larger than Advance Pharmaceutical's regular shipments to its established customers. Buzzeo offered as an example of circumstances indicating a suspicious shipment an order placed by a customer whose prior pseudoephedrine purchases had been linked to the illegal manufacture of methamphetamine.

To facilitate Advance Pharmaceutical's pre-reporting to the DEA of extraordinary or suspicious orders of pseudoephedrine, Buzzeo gave Hossain his business card and instructed him to call the DEA directly to make any report. Buzzeo explained that Hossain could comply with the statutory reporting requirements by initially making an oral report to an inspector over the telephone and then submitting a written report within fifteen days thereafter. Neither at this meeting nor at any other time did any defendant mention Advance Pharmaceutical's recent high-volume shipments of pseudoephedrine to first-time customers, each of which greatly exceeded its average 500,000–tablet shipment to its largest established customer, Rugby.

For example, just weeks before Hossain first met with Buzzeo, on November 11, 1997, defendants had shipped 6,014,880 pseudoephedrine tablets to Interstate. On November 18, 1997, defendants had sent 2,592,000 tablets to Top Form. Indeed, on December 1, 1997, the day before the Buzzeo meeting, defendants had sent Top Form a shipment containing 2,600,300 pseudoephedrine tablets.

Following the December 2, 1997 meeting, defendants continued to send large shipments of pseudoephedrine to new customers without notifying Buzzeo or anyone else at the DEA. During December 1997, Advance Pharmaceutical sent five shipments of pseudoephedrine tablets to Top Form totaling over eight million tablets and five shipments to Interstate totaling almost six million tablets. During this same one-month period, Advance Pharmaceutical shipped Rugby a total of 956,400 pseudoephedrine tablets.

2. *Receipt of DEA Administrative Subpoenas Warning of Illegal Use of Advance Pharmaceutical Products*

The following year, on or about September 15, 1998, Advance Pharmaceutical was

---

**6.** In fact, Kypridakes incorrectly stated that defendants' shipments to Top Form exceeded those to Rugby by approximately nine and one-half times, but we can correct this arithmetic error without altering the import of the witness's testimony.

served with a DEA administrative subpoena, alerting the company that some of its pseudoephedrine products (without specifying which shipments) had been discovered at illegal drug manufacturing sites in California. The subpoena directed the company to furnish information pertaining to its purchase and distribution of pseudoephedrine between January 1, 1996, and August 1, 1998. Defendants thereafter received two additional administrative subpoenas—on November 10, 1998, and February 8, 1999—requesting updated information pertaining to Advance Pharmaceutical's pseudoephedrine transactions after August 1, 1998. These subpoenas similarly warned defendants that Advance Pharmaceutical products had been linked to illegal drug manufacturing in California.

Despite being put on notice of the illegal use of their products (the very danger of which DEA investigators had warned defendants on December 2, 1997), defendants continued supplying customers with large volumes of sixty-milligram pseudoephedrine tablets without reporting the transactions to the DEA. After receiving the first two subpoenas, defendants sent two shipments, each containing 8,640,000 tablets, to Top Form. On February 8, 1999, the day that Advance Pharmaceutical received its third subpoena, defendants sent another 5,184,000 tablets to Top Form and began supplying pseudoephedrine tablets to a new customer, HFO, shipping 1,693,440 tablets without notifying the DEA.

### 3. *March 15, 1999 Meeting at the United States Attorney's Office*

On March 15, 1999, Liaquat Hossain met with federal officials at the United States Attorney's Office in the Eastern District of New York, at which time the reporting requirements of § 830(b)(1)(A) were again reviewed. At trial, Buzzeo, who was present at the meeting, testified that a federal prosecutor specifically informed Hossain that the government had determined that Advance Pharmaceutical's shipments to four of its new customers—Top Form, Interstate, Assured, and Oklatex—were extraordinarily large and, therefore, that defendants' failure to report these shipments to the DEA constituted a violation of relevant statutes and regulations. At the meeting, authorities further advised Hossain that pseudoephedrine tablets shipped by Advance Pharmaceutical to these new customers had been used in the illegal production of methamphetamine.

At the time of this meeting, Advance Pharmaceutical had not supplied pseudoephedrine to Interstate, Assured, or Oklatex for some months; nevertheless, with respect to Top Form, it continued to make unreported high-volume shipments. Notably, on March 26, 1999, only eleven days after the meeting at the United States Attorney's Office, Advance Pharmaceutical shipped 8,242,560 unreported tablets to Top Form, one of the ten largest shipments ever made to that customer.

### 4. *CBNE's Notice of Illegal Product Use*

On March 29, 1999, CBNE advised defendants in writing that Advance Pharmaceutical's pseudoephedrine products had been found at illegal methamphetamine laboratories in California. The CBNE letter specified nineteen such discoveries, noting both the brand names and lot numbers of the seized products. In an April 14, 1999 letter response, defendants identified Top Form, Assured, and Wildcat as the customers who had purchased the seized products. Defendants assured the CBNE that Advance Pharmaceutical was complying, and would continue to comply, with "all of the regulations that are promulgated in this area."

Despite these assurances, Advance Pharmaceutical never reported any subsequent transaction to either the CBNE or the DEA. In fact, on April 20, 1999—only six days after identifying Wildcat to the CBNE as one of the customers whose previous pseudoephedrine purchases had been linked to illegal activity—defendants sent Wildcat another 4,233,600 unreported tablets, the largest single shipment ever made by Advance Pharmaceutical to Wildcat. Additionally, defendants continued to supply sixty-milligram pseudoephedrine tablets to Top Form, sending nine shipments between June 18, 1999, and December 1, 1999, without any reports to federal or state officials.

### 5. *April 23, 1999 Meeting at the United States Attorney's Office*

Buzzeo testified that, on April 23, 1999, federal authorities again met with Liaquat Hossain at the United States Attorney's Office to discuss defendants' reporting obligations with respect to pseudoephedrine shipments. A federal prosecutor again informed Hossain that Advance Pharmaceutical's shipments to Top Form, Interstate, Assured, and Oklatex had involved extraordinary quantities and, therefore, required reporting. In addition, the prosecutor explained that Advance Pharmaceutical's shipments to Wildcat were also extraordinarily large and required reporting. At this meeting, federal officials supplied Hossain with charts comparing Advance Pharmaceutical's large pseudoephedrine shipments to these new customers with its smaller shipments to established customers. Defendants nevertheless continued to ship pseudoephedrine to both Top Form and Wildcat without ever notifying the DEA.

### 6. *DEA's Warning Letters*

John Uncapher, chief of the DEA's domestic control unit, testified that, beginning in April 1999, the DEA sent Advance Pharmaceutical twenty-four warning letters, alerting the company to the discovery of its pseudoephedrine products at illegal methamphetamine laboratories, dump sites, and other criminal settings. In each of these letters, the DEA identified the date and location of the seizure as well as the brand name and lot numbers of the products seized. The letters also attached and summarized the statutory and regulatory requirements that applied to distributors of such products. In the warning letter dated July 27, 1999, and in all letters thereafter, the DEA specifically stated: "Section 1310.05(a) and (b) require regulated person(s) report to the local DEA office any regulated transaction involving an extraordinary quantity of listed chemical, uncommon method of payment or delivery or any other suspicious act which may indicate[ ] that the listed chemical will be used in violation of this part." *See* 21 C.F.R. § 1310.05(a)-(b).

Defendants stipulated that, on or before April 22, 1999, they received the first two such DEA warning letters, advising them that recent searches of methamphetamine laboratories had uncovered pseudoephedrine tablets shipped by Advance Pharmaceutical to Top Form. A third such letter was received on August 4, 1999, and a fourth on December 1, 1999. Regardless, defendants continued to supply Top Form with sixty-milligram tablets of pseudoephedrine, making nine unreported shipments between June 18, 1999, and December 1, 1999. One such shipment was sent only two days after receiving the August 4, 1999 letter and another on December 1, 1999.

In the fourth warning letter, the DEA also notified defendants of the illegal use of pseudoephedrine products sent by Ad-

vance Pharmaceutical to HFO. Despite this warning, defendants made six unreported pseudoephedrine shipments to HFO between December 2, 1999, and April 26, 2000, totaling 6,789,540 tablets. Defendants similarly ignored a February 28, 2000 warning letter in which the DEA alerted them to the seizure of Advance Pharmaceutical tablets shipped to Maxx II. Defendants nevertheless sent Maxx II another 1,555,200 pseudoephedrine tablets over the next two months without ever notifying the DEA. A March 17, 2000 DEA warning letter informed the defendants of the discovery of their pseudoephedrine tablets shipped to Pharmasales at a site linked to illegal drug manufacturing. Approximately one month later, defendants sent Pharmasales an unreported shipment of 1,123,200 pseudoephedrine tablets.

## C. Jury's Findings on Liability

On July 20, 2001, a jury determined that defendants had violated the civil reporting requirements of the Controlled Substances Act by failing to notify the DEA with respect to 141 of its 159 pseudoephedrine shipments to "new customers." In returning its verdict, the jury excused defendants' failure to report certain early shipments to some new customers. No liability was found with respect to Advance Pharmaceutical's first five shipments of pseudoephedrine to Top Form, its first two shipments to Interstate, Assured, and Oklatex, and its first seven shipments to Wildcat. But the jury found that defendants had violated § 842(a)(10) in Advance Pharmaceutical's last fifty-two shipments to Top Form, its last eleven shipments to Interstate, its last ten shipments to Assured, its last four shipments to Oklatex, its last nineteen

shipments to Wildcat, and all shipments to new customers with whom it began to deal only after 1999, specifically, HFO, Maxx II, Pharmasales, and Seaside.[7]

Following receipt of the jury's verdict, the district court denied defendants' motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50(a).

## D. Monetary Penalty and Injunctive Relief

In August 2002, the district court held a three-day hearing to determine the monetary penalty to be imposed for the violations that the jury found and the scope of appropriate injunctive relief. Evidence presented at this hearing included defendants' profits on sales of pseudoephedrine in violation of the reporting requirements and defendants' ability to pay a penalty. Robert Rock, a certified public accountant, testified that defendants realized a $2,918,361 profit on the sales at issue. Rock further testified, based on his review of defendants' financial documents, that, at the time of the hearing, defendants were able to pay a penalty in excess of $2 million without impairing Advance Pharmaceutical's ability to continue operating or the Hossains' ability to meet their living expenses. According to Rock, three financial sources were available to permit defendants to pay a penalty: Advance Pharmaceutical's future profits; the Hossains' personal net assets; and the repayment to defendants of $1.6 million in outstanding "loans." Rock testified that these loans reflected a transfer of approximately $1.6 million of Advance Pharmaceutical's profits. For example, $1.3 million was transferred after defendants learned that their

---

7. The jury also determined that defendants committed one violation of 21 U.S.C. § 842(a)(5) by exporting pseudoephedrine tablets without submitting an application to the DEA for appropriate authorization. Defendants do not challenge this finding on appeal.

products had been found in connection with illegal drug activity, and none of these loan transactions was documented.

At the conclusion of the hearing, the district court made specific factual findings that defendants had violated § 842(a)(5) and (10) "intentionally" by acting in "complete disregard" for the Act's reporting requirements. Hearing Tr., Aug. 7, 2002, at 419. It further found that defendants had persisted in violating the law even after they had knowledge that some of their previous unreported shipments of pseudoephedrine had been diverted to illegal use, giving them "reasonable cause to believe" that their shipped tablets would be used illegally to manufacture methamphetamine. *Id.* at 420; *see* 21 U.S.C. § 843(a)(7). Accordingly, pursuant to § 843(f), the district court issued an injunction prohibiting defendants from manufacturing, distributing, importing, or exporting pseudoephedrine and from violating the reporting requirements with respect to any listed chemical. The court also imposed a $2 million civil penalty for the 141 violations of § 842 that the jury found.

### III. *Discussion*

#### A. *Sufficiency of the Evidence*

■ Defendants submit that the district court erred in denying their motion for judgment as a matter of law because the trial evidence was insufficient to support the jury's findings that they violated statutory reporting requirements with respect to 141 shipments of pseudoephedrine tablets. They further assert that, for the violations occurring on or after October 21, 1998, *see supra* at 382–83, the evidence was insufficient to establish that their conduct was negligent, much less that it was intentional, as the district court found in its penalty ruling.

■ A district court may enter judgment as a matter of law against a party only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a); *see Nadel v. Isaksson,* 321 F.3d 266, 271–72 (2d Cir.2003). We review a district court's denial of a Rule 50 motion *de novo, see Phillips v. Bowen,* 278 F.3d 103, 108 (2d Cir.2002), applying the same standards as the district court, *see Caruolo v. John Crane, Inc.,* 226 F.3d 46, 51 (2d Cir.2000); *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998). In this case, we conclude that defendants' sufficiency challenge is patently without merit.

■ In assessing the sufficiency of evidence to support a jury verdict, we must view the record in the light most favorable to the opposing party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor. *See Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d at 289. We will not set aside a judgment unless

(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Id.* (citations omitted).

Applying this standard of review to defendants' case, we conclude that the evidence amply supports the jury's verdict. Both the witness testimony and the documentary evidence detailed in our discussion of the facts established that the 141 shipments for which the jury found liability were all made to new customers with whom Advance Pharmaceutical had no

business relationship prior to October 31, 1997. The evidence showed that the quantities of pseudoephedrine tablets shipped to these customers were "extraordinary" in that they were several multiples higher than the quantities shipped to Advance Pharmaceutical's largest established customer, Rugby, during the same time periods. Defendants' awareness that such a comparative discrepancy triggered their reporting obligation was established by evidence of numerous meetings at which law enforcement officials explained this precise duty to defendant Liaquat Hossain. The evidence further demonstrated that defendants were repeatedly warned that a disturbing number of the pseudoephedrine tablets that they were shipping to their new customers were being used in the illegal manufacture of methamphetamine. The fact that defendants failed to report a single pseudoephedrine shipment despite these meetings and warnings established that their conduct was not only negligent, but intentional.

### 1. *Defendants' Obligation to Report the 141 Shipments*

Title 21 U.S.C. § 830(b)(1)(A) required defendants to report to the DEA any pseudoephedrine shipments that involved an "extraordinary" quantity or that defendants thought might be used in violation of the Controlled Substances Act. At the outset, we note that the jury was not required to specify for each violation which of these two statutory triggers applied. If the evidence was sufficient to support either reason, there cannot be "a complete absence of evidence supporting the verdict," requiring a court to set aside the judgment. *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d at 289. Indeed, even in criminal cases, where the government bears the heavier burden of proof beyond a reasonable doubt rather than mere preponderance, the law holds

that, "where one basis for conviction is 'unsupported by sufficient evidence,' a [jury's] verdict 'stands if the evidence is sufficient with respect to any one of the acts charged.'" *United States v. Salmonese,* 352 F.3d 608, 624 (2d Cir.2003) (quoting *Griffin v. United States,* 502 U.S. 46, 56–57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)).

In this case, it is obvious that Advance Pharmaceutical's pseudoephedrine sales to new customers were so extraordinarily large relative to its sales to established customers that defendants were required to report the shipments at issue to the DEA. Not only did Advance Pharmaceutical's total pseudoephedrine sales to each new customer vastly exceed (by *at least* three and one-half times) its sales to its largest established customer, Advance Pharmaceutical's pseudoephedrine sales to any single new customer also exceeded (by *at least* fifty percent) its sales to all established customers *combined.*

Defendants submit that aggregate comparisons between Advance Pharmaceutical's sales to its new and established customers are insufficient to prove its liability for failing to report extraordinary shipments. They insist that the jury was required to consider each individual shipment in isolation to determine whether it was sufficiently extraordinary to require reporting. They further submit that a statistical analysis of industry sales for pseudoephedrine was necessary to prove that the quantities involved in the 141 unreported shipments were extraordinary. Neither argument is convincing.

While industry statistics may sometimes be useful in demonstrating that unreported pseudoephedrine shipments are extraordinary, *see United States v. Grab Bag Distrib.,* 189 F.Supp.2d 1072, 1077–78 (E.D.Cal.2002), such evidence is

not essential to establish a duty to report. The Controlled Substances Act does not itself define the term "extraordinary quantity" as used in § 830(b)(1)(A). The term "extraordinary" does, however, have a common meaning: "not of the usual order or pattern" or "beyond what is usual, regular, common, or customary." *Webster's Third New Int'l Dictionary* 807 (2002). This definition, moreover, is consistent with one of the examples provided in the DEA-supplied *Chemical Handler's Manual* to assist regulated persons in identifying suspicious orders requiring reporting: "A customer who purchases unusual quantities . . . in contrast with customary practice and usage." U.S. Dep't of Justice, DEA, *Chemical Handler's Manual: An Informational Outline of the Chemical Diversion & Trafficking Act of 1988,* at 12 (1990). While this common-sense definition of "extraordinary" could certainly be applied to industry-wide transactions, it makes equal sense to apply it to the regulated person's own experience. Indeed, the latter application is less burdensome on regulated persons because it focuses their attention on their own customary business operations, with which they are presumably familiar, and does not demand constant monitoring of industry patterns as a whole. The *Chemical Handler's Manual* appears to encourage regulated persons to use their own sales experiences as a basis for reporting decisions, noting that "[e]ach regulated person is most familiar with its customers and the circumstances surrounding the orders it processes." *Id.* at 11. Accordingly, we conclude that the question of whether a particular pseudoephedrine shipment is of a sufficiently extraordinary quantity to require reporting to the DEA does not demand statistical proof of industry-wide transactions. A jury may resolve this question by reference to evidence of the regular and customary pseudoephedrine transactions engaged in by the regulated person whose conduct is at issue.

■ We similarly reject defendants' argument that the jury was required to view each unreported shipment in isolation to determine whether it was extraordinary. Such a rule would, in fact, mislead the jury. Defendants, after all, did not fill each pseudoephedrine order here at issue in a factual vacuum, ignorant of past orders by that customer or others. The jury was entitled to consider all facts and circumstances known to a regulated defendant at the time it shipped a particular order in determining whether it would reasonably have viewed that shipment as sufficiently extraordinary to require reporting to the DEA. The verdict in this case strongly suggests that the jury engaged in just such a common-sense analysis, excusing defendants' earliest reporting omissions when the extraordinary nature of their new customers' purchases may not yet have been apparent, but imposing liability when the disturbing pattern of high-volume purchases and diversion of pseudoephedrine to criminal purposes could no longer be denied.

■ For example, the jury did not find defendants liable for a number of large pseudoephedrine shipments to Top Form before December 17, 1997. Considerable evidence, however, supports the jury's verdict holding defendants liable for all unreported shipments to this customer after that date. It was, of course, in early December 1997 that defendant Liaquat Hossain met with Inspector Buzzeo, who specifically explained that § 830(b)(1)(A) required Advance Pharmaceutical to prereport any pseudoephedrine shipments that were significantly larger than those routinely sent by the company to its established customers. The unreported December 17, 1997 shipment to Top Form

for which defendants were held liable involved nearly three million pseudoephedrine tablets, approximately six times the average Advance Pharmaceutical shipment to Rugby and by far the largest single shipment made by defendants to any customer within the past year. Moreover, this shipment brought the total number of pseudoephedrine tablets shipped by Advance Pharmaceutical to Top Form in the month of December to almost eleven million.[8] This evidence was more than sufficient to support the jury's verdict holding defendants civilly liable for failing to report this shipment of a listed chemical to the DEA.

 Of the remaining fifty-one unreported pseudoephedrine shipments to Top Form for which defendants were held liable, only eight involved quantities of less than one million tablets. For these few smaller shipments, which by themselves might not have appeared extraordinary, liability was satisfactorily established either because evidence of a previous day's shipment would have indicated to defendants that the total quantity shipped within that brief time was extraordinary or because defendants persisted in failing to report shipments to this customer even after being advised by the DEA and the CBNE that tablets sold to this distributor had been linked to the illegal manufacture of methamphetamine.

 The trial evidence similarly sufficed to support the jury's finding of defendants' liability for unreported shipments to Interstate, Assured, Oklatex, and Wildcat. The majority of the Interstate shipments on which the jury found liability involved well over one million pseudoephedrine tablets; those shipments not themselves of such an extraordinarily large size were transmitted in such close temporal proximity to another shipment as to support a jury conclusion that the two should be viewed as an extraordinary whole. Similarly with respect to Assured, the jury could fairly conclude that the ten shipments sent in the one-month period between March 27, 1998, and April 21, 1998, totaling over ten million tablets, were properly viewed as an extraordinary whole that should have been reported to the DEA. Each of the Oklatex shipments on which the jury found liability contained well over a million tablets, and the majority of these involved more than two million. Indeed, by the first Oklatex shipment on which the jury found liability, defendants had already sent Oklatex over five million tablets within a one-week period, which circumstances were sufficient to alert defendants that this customer was engaging in extraordinary transactions that required reporting to the DEA. As for Wildcat, all but one of defendants' pseudoephedrine shipments to this customer involved more than one million tablets,[9] with some shipments containing over four million tablets. While the jury excused defendants' failure to report their first seven shipments to Wildcat, by the time it held defendants liable for failing to report their eighth shipment, the evidence indicated that they had shipped over five million unreported tablets within a one-month period, circumstances that plainly evidenced extraordinary quantities.

8. Defendants shipped pseudoephedrine tablets to Top Form on December 1, 9, 10, 11, and 17, 1997. At trial, defendant Tasrin Hossain acknowledged that, at a customer's request, Advance Pharmaceutical would sometimes divide an order among several shipments transmitted within a short period of time. CBNE witness Kypridakes testified that pseudoephedrine distributors often "structured" shipments to avoid arousing law enforcement suspicion.

9. The one exception was a Wildcat shipment containing 970,680 tablets.

Finally, the evidence sufficed to support the jury's finding that every one of defendants' pseudoephedrine shipments to HFO, Maxx II, Pharmasales, and Seaside required reporting to the DEA. Defendants' individual shipments to these customers were extraordinary in that they contained over one million tablets or were part of a number of shipments transmitting extraordinary quantities of tablets within a relatively brief period of time. Moreover, defendants began doing high-volume business with these customers only after they learned that similar multi-million tablet dealings with other "new customers" had resulted in large quantities of Advance Pharmaceutical's pseudoephedrine products being found at sites associated with the illegal manufacture of methamphetamine. For example, when defendants began shipping sixty-milligram pseudoephedrine tablets to HFO on February 8, 1999, they had already received at least two subpoenas from the DEA reporting such illegal use of Advance Pharmaceutical's products. Even after December 1, 1999, when defendants specifically learned that tablets shipped to HFO had been found at methamphetamine laboratories, defendants continued to ship millions of pseudoephedrine tablets to HFO without reporting to the DEA. In the fall of 1999, defendants began shipping unreported pseudoephedrine tablets to three other new customers, Maxx II, Pharmasales, and Seaside, similarly ignoring DEA warning letters when some of these tablets were also linked to methamphetamine manufacture.

Defendants submit that the government could not rely on their receipt of general warnings regarding product diversion to trigger the "any other circumstance" provision of § 830(b)(1)(A). We disagree. Evidence that defendants continued to make unreported shipments to particular customers after receiving explicit warnings with respect to those customers certainly demonstrated defendants' contempt for the statutory reporting requirements. But the jury could also reasonably have concluded that defendants' receipt of more general warnings regarding the illegal diversion of high-volume orders obligated defendants to report similar large shipments to any customers with whom they had only recently developed a business relationship. In sum, defendants' duty to report each of the 141 shipments at issue was supported by a preponderance of the evidence showing that defendants (1) were shipping pseudoephedrine tablets to a number of new customers in quantities far in excess of the amounts sent to established customers, (2) knew from meetings with law enforcement authorities that they should treat such comparatively large shipments as "extraordinary" for reporting purposes, and (3) had further reason to report such large orders after receiving numerous DEA and CBNE warnings linking Advance Pharmaceutical's recent high-volume shipments to methamphetamine manufacture.

### 2. Negligent or Intentional Failure to Comply with Requirements

Defendants assert that, even if they were obliged to report these 141 pseudoephedrine shipments, the evidence was insufficient to establish that violations occurring on or after October 21, 1998, were "negligent," much less "intentional" as the district court found. They further challenge the sufficiency of the evidence to support the district court's finding, necessary to its grant of injunctive relief, that defendants had "reasonable cause to believe" that pseudoephedrine tablets shipped by them would be used illegally. 21 U.S.C. § 843(a)(7), (f)(1). These arguments merit little discussion because the evidence amply supports the district

court's conclusion that defendants had reasonable cause to believe that their pseudoephedrine shipments to certain customers would be used illegally and that all reporting violations found by the jury were not merely negligent but intentional and made "in complete disregard" of the statutory reporting requirements. Hearing Tr., Aug. 7, 2002, at 419.

Because we have already discussed much of the relevant evidence in some detail, we here review only a few examples illustrating defendants' obstinacy. Only six days after a March 15, 1999 meeting at which federal officials advised defendants that pseudoephedrine tablets previously shipped by them to new customer Top Form had been found at a methamphetamine site, defendants boldly sent Top Form an additional 8,242,560 tablets without notifying the DEA. Six days after a shipment to new customer Wildcat was linked to an illegal laboratory site, defendants sent Wildcat 4,233,600 tablets—the largest shipment ever made to this customer—also without reporting the transaction to the DEA. Similarly, defendants continued to transmit millions of unreported pseudoephedrine tablets to HFO, Maxx II, and Pharmasales despite DEA warning letters that tablets shipped by defendants to these new customers had been linked to illegal drug manufacturing. We conclude that such conduct sufficed not only to demonstrate defendants' "reasonable cause to believe" that continued unreported shipments of pseudoephedrine to these customers would be used, at least in part, in violation of the Controlled Substances Act, but also supported an inference that all 141 of defendants' reporting violations were, in fact, committed intentionally.

B. *Defendants' Vagueness Challenge to § 830(b)(1)(A)*

■ Separate and apart from their evidentiary sufficiency challenge, defendants submit that penalizing them for violating § 830(b)(1)(A) offends due process because the statute failed to give them adequate notice of when they were required to report pseudoephedrine transactions. Defendants specifically challenge as unconstitutionally vague two statutory phrases intended to trigger reporting requirements: (1) transactions involving "an extraordinary quantity of a listed chemical" and (2) transactions involving "any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of [the Act]." 21 U.S.C. § 830(b)(1)(A). When this vagueness argument was first raised on defendants' motion for summary judgment, the district court rejected it as without merit. We review this legal issue *de novo, see Richmond Boro Gun Club, Inc. v. City of New York,* 97 F.3d 681, 684 (2d Cir.1996), and similarly conclude that defendants' vagueness challenge is meritless.

■ In response to an inquiry at oral argument, defendants clarified that they challenge the vagueness of § 830(b)(1)(A) only as applied to their case; they do not argue facial vagueness. Accordingly, our due process inquiry is limited to the particular circumstances of this case; we do not consider the possible vagueness of § 830(b)(1)(A) in "hypothetical applications" not presently before the court. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186 (1982). Such a narrowly focused inquiry comports with a principle long " '[e]mbedded in the traditional rules governing constitutional adjudication ... that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not be-

fore the Court.'" *Parker v. Levy,* 417 U.S. 733, 759, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)); *see United States v. Rybicki,* 354 F.3d 124, 129 (2d Cir.2003) (en banc) (acknowledging long-standing principle that a vagueness challenge to a statute that does not implicate First Amendment rights must be examined "in light of the specific facts of the case at hand and not with regard to the statute's facial validity").

▌ The degree of statutory imprecision that due process will tolerate "varies with the nature of the enactment and the correlative needs for notice and protection from unequal enforcement." *Association of Int'l Auto. Mfrs. v. Abrams,* 84 F.3d 602, 614 (2d Cir.1996) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 498, 102 S.Ct. 1186). A civil statute is generally deemed unconstitutionally vague only if it commands compliance in terms "'so vague and indefinite as really to be no rule or standard at all.'" *Id.* at 614 (quoting *Boutilier v. INS,* 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967)). When a civil statute imposes penalties that, "although civil in description, are penal in character," *United States v. Clinical Leasing Serv.,* 925 F.2d 120, 122 & n. 2 (5th Cir.1991), the statute is sometimes deemed "quasi-criminal" and subjected to stricter vagueness review, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 499, 102 S.Ct. 1186. Such a statute is deemed impermissibly vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," or to "provide explicit standards for those who apply them." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The defendants sub-

mit that § 842(a)(10) is quasi-criminal, and the government does not disagree, arguing simply that the statute satisfies the sterner vagueness test. *See Village of Hoffman Estates v. Flipside. Hoffman Estates, Inc.,* 455 U.S. at 500, 102 S.Ct. 1186 (applying "relatively strict test" where "village concedes that the [challenged] ordinance is 'quasi-criminal'"), and *United States v. Clinical Leasing Serv.,* 925 F.2d at 122 & n. 2 (finding another civil penalty provision of the Controlled Substances Act, 21 U.S.C. § 842(a)(2), "warrants a relatively strict test," because "the Government does not dispute that [§ 842(a)(2)] authorizes fines which, although civil in description, are penal in character"). This Court need not here decide whether § 842(a)(10) is, in fact, quasi-criminal because, even if we were so to rule, defendants' vagueness challenge would fail.

The vagueness test articulated in *Grayned* is not applied mechanically. Its sternest application occurs when a law "threatens to inhibit the exercise of constitutionally protected rights," particularly those protected by the First Amendment. *Village of Hoffman Estates v. Flipside. Hoffman Estates, Inc.,* 455 U.S. at 499, 102 S.Ct. 1186; *see also City of Chicago v. Morales,* 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, J., plurality opinion) (noting propriety of facial vagueness review when statute infringes on constitutionally protected rights); *Parker v. Levy,* 417 U.S. at 759, 94 S.Ct. 2547 (noting exception in First Amendment context to traditional rule against facial attacks); *Chatin v. Coombe,* 186 F.3d 82, 86–87 (2d Cir.1999) (closely scrutinizing prison rule implicating free exercise of religion); *General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 286 (2d Cir.1997) (stating general principle that statutes implicating constitutionally protected rights are subject to "more stringent" vagueness

analysis). When, as in this case, no constitutional rights are implicated and a statute regulates only economic activity, the Supreme Court approves a "less strict vagueness" review. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. at 498, 102 S.Ct. 1186. This greater tolerance is informed, in part, by recognition that "businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* "Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Id.; see also Association of Int'l Auto. Mfrs., Inc. v. Abrams,* 84 F.3d at 614; *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 855–56 (2d Cir.1984); *United States v. Sun & Sand Imp., Ltd.,* 725 F.2d 184, 187 (2d Cir.1984); *Toy Mfrs. of Am., Inc. v. Consumer Prod. Safety Comm'n,* 630 F.2d 70, 78–79 (2d Cir.1980). In this case, defendants not only had "the ability to clarify" any ambiguity in the language of the challenged reporting requirement; they in fact had such language clarified for them in no less than three meetings with federal authorities.

As we have already observed, the common sense meaning of the phrase "extraordinary quantity" in § 830(b)(1)(A) suffices to alert any manufacturer that it must report pseudoephedrine quantities that go "beyond what is usual, regular, common, or customary." *Webster's Third New Int'l Dictionary* 807. Moreover, this definition is echoed in the DEA's *Chemical Handler's Manual,* which is made available to all regulated persons. *See supra* at 392. To the extent defendants may have had a question as to whether they could rely on

their own sales experiences to gauge what qualified as a "usual, regular, common, or customary" pseudoephedrine transaction or whether it was necessary for them to keep abreast of industry-wide sales patterns, the matter was clarified for them at the December 2, 1997 meeting with DEA investigators and in two subsequent meetings with federal prosecutors: defendants were specifically instructed that they should consider the usual orders placed by their established customers in determining whether a particular order was for an "extraordinary quantity" so as to require reporting to the DEA. Because the jury's findings of liability all pertain to drug transactions occurring after the December 2, 1997 meeting at which DEA investigators first clarified this point, defendants cannot here claim that this part of the statutory reporting requirement was unconstitutionally vague as applied to their case. *See generally Marchi v. Bd. of Coop. Educ. Servs. of Albany,* 173 F.3d 469, 480 (2d Cir.1999) (concluding that challenged directive, as applied to teacher who had received "extensive guidance" of its parameters, provided adequate notice of proscribed conduct); *United States v. Clinical Leasing Serv.,* 925 F.2d at 122–23 (concluding that it was unlikely that defendants were misled by "ambiguous" statutory language in light of multiple warnings received).[10]

 Similarly unconvincing is defendants' vagueness challenge to § 830(b)(1)(A)'s reporting requirement with respect to "any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of [the Controlled Sub-

---

10. The administrative clarification also protected against arbitrary or discriminatory enforcement by referring law enforcement officials, in the first instance, to a regulated business's own sales records to determine whether there were some sales in such extraordinary quantities that the business should have filed the reports required by law.

stances Act]." While this language is certainly broad, its application is limited to what "the regulated person believes." Such a scienter requirement generally saves a statute from unconstitutional vagueness. *See United States v. Curcio*, 712 F.2d 1532, 1543 (2d Cir.1983) (Friendly, J.); *cf. Colautti v. Franklin*, 439 U.S. 379, 395, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (and cases cited therein) (recognizing that "the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea* "). Further, in this case, defendants were specifically advised by federal officials that one circumstance that should arouse their suspicion about the illegal use of their products was the placement of pseudoephedrine orders by customers who had previously received tablets subsequently linked to the manufacture of methamphetamine. Defendants received—and ignored—repeated notices that large quantities of pseudoephedrine tablets shipped to some of their customers were being found at methamphetamine laboratory sites. Indeed, 34.5 million tablets manufactured by Advance Pharmaceutical were discovered at such sites, more than four times the amount attributable to any other pseudoephedrine supplier. Under these circumstances, defendants' continued unreported shipment of pseudoephedrine to suspect customers did not evidence any ignorance or uncertainty about the law's reporting requirements; it evidenced an obstinate refusal to comply with the law.

### C. Relief Ordered by the District Court

Defendants urge this court to vacate both the monetary award entered by the district court as excessive and unsupported by the evidence and the permanent injunction as overly broad in scope. We review these challenges to the awarded relief for an abuse of discretion. *See Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir.2004) (reviewing permanent injunction for abuse of discretion); *United States v. J.B. Williams Co.*, 498 F.2d 414, 438 (2d Cir.1974) ("[D]etermination of the amount of penalties within the maximum is committed to the informed discretion of the district judge[.]"); *see also United States v. Green Drugs*, 905 F.2d 694, 698 (3d Cir.1990) (recognizing district court's discretion in assessing civil penalties under 21 U.S.C. § 842(c)). We will find such abuse only if the district court relied on clearly erroneous findings of fact or made an error in its construction or application of relevant law. *See Shain v. Ellison*, 356 F.3d at 214. Neither concern is present here.

### 1. Monetary Penalty

As noted earlier in this opinion, *see supra* at 382–83, § 842(c)(1)(B) was amended, on October 21, 1998, to reduce the maximum penalty for civil violations of § 842(a)(5) and (10) from $25,000 to $10,000 per violation. In their reply brief, defendants concede that this amendment does not operate retroactively.[11] Indeed,

---

**11.** Rather than argue that the amended § 842(c)(1)(B) applies retroactively to all 141 violations of § 842(a)(10), thereby capping the maximum civil monetary penalty at $1,410,000, defendants submit simply that the district court should have acknowledged Congress's reappraisal of "the seriousness of the offense," *Reply Brief for Defendants–Appellants*, at 28, by exercising its discretion to award no more than $10,000 for any of the

141 violations, even those occurring before the amendment date. Because defendants have waived any retroactivity argument, this court need not consider the interaction between the amendment to § 842(c)(1)(B) and the general savings clause, *see* 1 U.S.C. § 109, which "Congress enacted ... to abolish the common-law presumption that the repeal of a criminal statute resulted in the abatement of 'all prosecutions which had not reached final

they can hardly argue to the contrary, having stipulated to the application of the two versions of the statute in the parties' signed Pre-trial Order. *See* Joint Pre-trial Order, Oct. 10, 2000, Stipulations of Fact and Law, at ¶ 5 ("The maximum amount of the penalty is $25,000.00 for each violation occurring prior to October 21, 1998 and $10,000.00 for each violation occurring on or after October 21, 1998."). Therefore, applying the statutory maxima from both before and after the 1998 amendment to the relevant violations of the Act's reporting requirements (seventy-two violations before October 21, 1998, and sixty-nine violations after that date), the district could have imposed on defendants a monetary penalty of up to $2,490,000. Defendants nevertheless submit that the district court's civil award of $2 million was excessive. We disagree.[12]

█ A district court may properly consider "a number of factors" in determining the size of a civil penalty, "including the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay." *United States v. J.B. Williams Co.*, 498 F.2d at 438. Thus, in

determining monetary penalties under § 842(c), district courts have frequently considered four factors: (1) the level of defendant's culpability, (2) the public harm caused by the violations, (3) defendant's profits from the violations, and (4) defendant's ability to pay a penalty. *See, e.g., United States v. Salcedo*, 2003 WL 21196843, at *2 (E.D.N.Y. Feb.19, 2003); *United States v. Poulin*, 926 F.Supp. 246, 253–54 (D.Mass.1996); *United States v. Queen Vill. Pharmacy*, 1990 WL 165907, at *2 (E.D.Pa. Oct.25, 1990); *United States v. Barbacoff*, 416 F.Supp. 606, 610 (D.D.C. 1976).

Applying these factors to this case, the district court reasonably concluded from the totality of the evidence that defendants' § 830(b)(1)(A) reporting violations (1) were deliberate and persistent and (2) caused real and significant public harm by facilitating the diversion of millions of pseudoephedrine tablets to the manufacture of methamphetamine. In this light, the district court acted well within its discretion in concluding that a civil penalty should, in essence, divest defendants of all

---

disposition in the highest court authorized to review them.' " *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974) (quoting *Bradley v. United States*, 410 U.S. 605, 607, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973)). *See also Landgraf v. USI Film Prods.*, 511 U.S. 244, 271–72, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (noting that § 109 abrogated the common-law rule that "repealing a penal provision (whether criminal or civil) ... [was] understood to preclude punishment for acts antedating the repeal"); *United States v. Van Horn*, 836 F.2d 1235, 1237 (9th Cir.1988) (finding "no authority for the proposition that 1 U.S.C. § 109 does not apply to civil penalties and forfeitures in the same manner as to criminal fines and forfeitures"). For our purposes, it suffices to say that defendants did not deserve more lenient treatment from the district court—as a matter of either law or equity—for their pre-amendment violations of

§ 842(a)(10) because they continued intentionally to flout § 830(b)(1)(A)'s reporting requirements long after Congress amended § 842(c)(1)(B). *Cf. United States v. De Simone*, 468 F.2d 1196, 1199–200 (2d Cir.1972) (rejecting argument that defendant whose conspiracy continued after date of amendment providing for parole eligibility should not be subject to no-parole provision of predecessor statute).

12. We recognize that the penalty awarded by the district court did exceed the $1,750,000 sought by the government in its pleadings. It is well-settled, however, that a plaintiff's recovery is not limited to the amount demanded except when judgment is entered by default. *See Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir.1993) (citing Fed. R.Civ.P. 54(c)).

profits made in connection with the unreported transactions.

The district court's adoption of a $2 million gross profit figure comported with the thirty-to-forty percent profit range stipulated to by defendants on sales of $5,076,000 for the 141 shipments at issue. Indeed, the figure was conservative by comparison to the $2,918,316 profit estimate by the government's trial expert. Defendants, however, contend that the district court should have relied on net, rather than gross, profits in imposing a penalty to account for Advance Pharmaceutical's business operating expenses. We decline to hold that reliance on gross profit figures necessarily constitutes an abuse of discretion in calculating a § 842(c) penalty. In rejecting a similar challenge to a RICO forfeiture order, this court noted that the difference between gross and net profits is often so "speculative" and so much a function of "bookkeeping conjecture," that "[u]sing net profits as the measure for forfeiture could tip [certain] business decisions in favor of illegal conduct." *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498–99 (2d Cir.1985). The same logic pertains to § 842(c) civil penalties, and, in the circumstances of this case, we conclude that there was no abuse of discretion in an award based on gross profits.

■ Finally, the district court did not clearly err in finding that defendants' financial condition evidenced an ability to pay a $2 million penalty. Although defendants argued that Advance Pharmaceutical's operations had been so adversely affected by the enforcement action that they could not pay this amount, the district court's contrary conclusion was reasonably supported by financial statements and expert opinion indicating the company's ability to continue operating profitably as well as evidence that defendants had engaged

in a series of suspicious loans to shield approximately $1.6 million in assets.

Accordingly, we reject defendants' argument that a $2 million civil penalty was excessive either as a matter of law or fact.

### 2. *Permanent Injunction*

■ Title 21 U.S.C. § 843(f)(3) states that any injunctive relief ordered by the court "shall be tailored to restrain violations of ... section 842." In this case, the district court reasoned that "the number, circumstances and repeated disregard by the defendants of reporting requirements as to pseudoephedrine" required a stern injunction permanently prohibiting defendants from manufacturing or distributing that listed chemical. Hearing Tr., Aug. 2, 2002, at 421. Given that defendants persisted in refusing to comply with the statutory reporting requirements for pseudoephedrine despite repeated face-to-face meetings with law enforcement officials at which defendants were carefully instructed about their duty to report, and even after warnings advising defendants that millions of their unreported tablets had been diverted to illegal methamphetamine manufacture, we conclude that the district court acted well within its broad discretion in barring defendants from any future dealing in this regulated substance.

■ Defendants submit that the injunction may, at some future time, adversely affect their ability to pay the monetary penalty imposed by the district court. This possibility is not a ground for us to reverse or vacate the injunction for abuse of discretion. Rather, should the forecast circumstance arise, defendants may seek appropriate relief. *See* Fed. R.Civ.P. 60(b)(5); *Davis v. N.Y.C. Housing Auth.*, 278 F.3d 64, 88 (2d Cir.2002) ("It is, of course, well established that a district court has the power, in the exercise of its discretion, to modify its past

injunctive decrees in order to accommodate changed circumstances."); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir.1983) ("The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible."). On the present record, this court declines to upset the district court's equitable order.

## IV. *Conclusion*

To summarize, we conclude that (1) sufficient evidence was adduced to support the jury's finding of 141 violations of 21 U.S.C. § 842(a)(10) and, therefore, the district court properly denied defendants' motion for judgment as a matter of law; (2) as applied to the circumstances of this case, the reporting requirements of § 830(b)(1)(A) are not unconstitutionally vague; and (3) the district court did not abuse its discretion in ordering either a $2 million civil penalty or a permanent injunction barring defendants from the further manufacture or distribution of pseudoephedrine.

The judgment of the district court is AFFIRMED.